## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

JEREMY COLTON LIGHT,

      Plaintiff,

v.                                                     Case No. 2:23-cv-00720

ST. ALBANS POLICE DEPARTMENT,
PTLMN. C.A. BECKNER, PTLMN. H.K. BURDETTE,
ANDREW CABELL, and LIEUTENANT A.C. TRUITT,

      Defendants.

### PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Frank W. Volk, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court are Defendants' Motion for Summary Judgment (ECF No. 118) and Plaintiff's Motion for Summary Judgment (ECF No. 122), both of which are fully briefed and ripe for resolution.

I.      *FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY*

On December 18, 2021, while on patrol in the City of St. Albans, St. Albans Police Department ("SAPD") Ptlm. C.A. Beckner ("Beckner") and Ptlm. Andrew Cabell ("Cabell"), who was a passenger in Beckner's cruiser, observed a motorcycle with an expired registration, operated by Plaintiff, fail to stop at a red light.  (Pl. Depo., ECF No.

133-1, at 16-18[1]; SAPD Case Report Detail No. 2021-00013069, ECF No. 118, Ex. 2). Beckner then activated his cruiser's lights and siren. (ECF No. 133-1 at 16; ECF No. 118, Ex. 2). Although Plaintiff knew the police were trying to stop him, he fled to avoid arrest and led law enforcement on a high-speed chase through St. Albans on Route 60, before crossing the Kanawha River and entering onto Interstate 64. He then exited the interstate and proceeded through the City of Dunbar and then across the Dunbar Toll Bridge into South Charleston. (ECF No. 118, Ex. 2.; *see also* Def. Cabell's Answers to Plaintiff's Interrogatories, at INT 1, ECF No. 118, Ex. 5). Beckner led the pursuit, later followed by Lt. A.C. Truitt ("Truitt") and Ptlm. Hannah Burdette ("Burdette"), and they were also joined by officers of other law enforcement agencies who are not defendants herein. (Def. Truitt's Answers to Plaintiff's Interrogatories, at INT 1, ECF No. 118, Ex. 3; Def. Burdette's Answers to Plaintiff's Interrogatories at INT 1, ECF No. 118, Ex. 4). During this pursuit, it was snowing and/or raining, and Plaintiff was driving on a suspended license. (ECF No. 133-1 at 13).

As he exited the Dunbar Toll Bridge, Plaintiff's motorcycle entered a loop to turn onto MacCorkle Avenue. (*Id.*) Plaintiff alleges his vehicle was bumped in the rear by Beckner's cruiser, causing Plaintiff to lose control and crash. (*Id.* at 21). Beckner, on the other hand, contends that Plaintiff was already sliding and bumped his cruiser as his motorcycle crashed to the ground. (ECF No. 118, Ex. 2 at 9; ECF No. 118, Ex. 6, INT II; Ex. 3, INT 1 and 6; Ex. 5, INT 1 and 6).

---

[1] Defendants attached excerpts of Plaintiff's deposition transcript as Exhibit 1 to their Motion for Summary Judgment. (ECF No. 118, Ex. 1). However, on April 23, 2025, pursuant to the undersigned's order, Defendants filed a complete copy of the transcript. (ECF No. 133-1). When citing to Plaintiff's deposition transcript, the undersigned will cite to the CM/ECF pagination found at the top of each page found in ECF No. 133-1.

After Plaintiff crashed, officers exited their vehicles to approach Plaintiff to arrest him. (ECF No. 133-1 at 28-30). Defendants contend that Plaintiff, who is six feet, two inches tall and, at the time, weighed 220 pounds, physically resisted their efforts to remove his hands from under his torso to handcuff him. (*Id.* at 27; ECF No. 118, Ex. 6, INT IV; *see also* Ex. 2; Ex. 3, INT 1, 3, 7; Ex. 4, INT 1, 3, 7; Ex. 5, INT 1, 3, 7). Plaintiff, on the other hand, testified that a male officer immediately approached him and started physically striking him, causing him to draw his arms into his sides to protect himself from the blows he was receiving, and that he was struck multiple times, but does not know specifically who struck him. (ECF No. 133-1 at 29, 33-34).

As the struggle continued, Beckner and Burdette deployed their tasers. (*Id.*; ECF No. 118, Ex. 6, INT III; Ex. 2; Ex. 3, INT 1; Ex. 4, INT 1; Ex. 5, INT 1). However, Plaintiff testified he only recalled being tased once, as he was in and out of consciousness. (ECF No. 133-1 at 30-31). Plaintiff further testified that he remembered "coming to when we were getting up and the lieutenant being on top of me." (*Id.* at 35). Plaintiff acknowledged that he "recognized him to be a lieutenant because his badge was gold." (*Id.*)

Defendants contend that Plaintiff had a knife in the front pocket of his coveralls and that they subsequently found another knife, among other weapons, on his person once he was in custody. (ECF No. 118, Ex. 2 at 9; Ex. 3, INT 1; Ex. 5, INT 1). Conversely, Plaintiff testified that the knife in question was underneath his body and could not have been seen by the officers until they stood him up after being handcuffed and, thus, it was not an available dangerous weapon at that time. Plaintiff acknowledged that no force was used against him after he was handcuffed. (ECF No. 133-1 at 39-40). As acknowledged by Defendants, there is no dash or body camera footage from this incident, as the same is

3

not required by state law and the City of St. Albans does not outfit its officers with such equipment.  (ECF No. 118, Ex. 3, INT 12, 14; Ex. 4, INT 12, 14; Ex. 5, INT 12, 14).

Following his arrest and processing at the police station, Plaintiff was taken to Thomas Memorial Hospital, but he declined treatment, signing a waiver of refusal.  (ECF No. 133-1 at 9, 41-44; ECF No. 118, Ex. 2).  Nor did Plaintiff seek any medical treatment once he arrived at the jail.  (ECF No. 133-1 at 43).  Plaintiff further concedes that he did not receive any medical treatment whatsoever for the injuries he alleges to have suffered because of these events.  (*Id.* at 44).  Moreover, Plaintiff admits he did not suffer any monetary losses because of this incident.  (*Id.* at 56).  Plaintiff ultimately pled guilty to one felony count of Fleeing with Reckless Indifference to the Safety of Others stemming from this incident.  (Indictment No. 23-F-33 (Kan. Cnty. Cir. Ct.) and June 1, 2023 Order, ECF No. 118, Ex. 9).

This matter is proceeding on Plaintiff's Amended Complaint (ECF No. 81), filed on September 26, 2024.  The Amended Complaint, which is pled in a largely conclusory manner, appears to assert the following seven claims for relief against all Defendants:  a claim of excessive force under the Fourth and Fourteenth Amendments of the United States Constitution (Count I)[2]; conspiracy to violate Plaintiff's constitutional rights under 42 U.S.C. § 1985 (Count II); a state law claim of intentional infliction of emotional distress (Count III); a state law claim of negligence (Count IV); a claim of deliberate indifference under the Fourteenth Amendment of the United States Constitution (Count V); a state law claim of assault and battery (Count VI); and a claim of failure to intervene under the Fourth Amendment (Count VII).  Defendants also interpret the Amended Complaint to

---

[2] Plaintiff's Amended Complaint did not plead specific "counts."  The counts herein were labeled as such by Defendants in their Memorandum in Support of their Motion for Summary Judgment (ECF No. 119 at 4).  For ease of reference, the undersigned adopts those labels herein.

be raising the following additional claims against specific defendants: Failure to train and supervise claims against the St. Albans Police Department ("SAPD") and Lt. Truitt (Counts VIII and IX)[3]; a § 1983 municipal liability claim against the SAPD (Count X); and a § 1983 supervisory liability claim against Lt. Truitt (Count XI).

Following a period for discovery, Defendants collectively filed their pending Motion for Summary Judgment, with accompanying exhibits (ECF No. 118), and a Memorandum of Law in support thereof (ECF No. 119). Plaintiff filed his own Motion for Summary Judgment (ECF No. 122), addressing the liability of each defendant therein. Pursuant to the holding of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Plaintiff, as a pro se litigant, was advised of his right and obligation to respond to Defendants' motion and of the evidence and materials upon which he could rely to rebut Defendants' evidence, as provided in Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 35 at 3-4; ECF No. 121). Both motions are fully briefed. The undersigned will address the briefing as necessary *infra*.

## II.    STANDARD OF REVIEW

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows there

---

[3] It is unclear from the Amended Complaint whether Plaintiff's failure to train and supervise claims are raised as constitutional claims under § 1983 or state law claims grounded in negligence – which is a notable distinction. As further addressed *infra*, although Defendants labeled these claims in their motion for summary judgment as "negligent training and supervision" claims, a careful review of the parties' motion documents demonstrates that both Defendants and Plaintiff addressed these claims only under the standards applicable to § 1983 constitutional claims, not state law negligence standards. Accordingly, the undersigned will also address these claims under only the § 1983 standards. If Plaintiff intended to bring separate state law claims of negligent training and supervision against the City of St. Albans and its Police Department or its supervisors, the undersigned proposes that the presiding District Judge **FIND** that the parties' motions have not sufficiently addressed such claims and that both motions for summary judgment should be denied on that basis.

> is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim. *Celotex,* 477 U.S. at 322-23. The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once the moving party demonstrates a lack of evidence, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). "A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements." *Brown v. Showboat Altantic City Propoco, LLC,* No. 08-5145, 2010 WL 5237855, *2 (D.N.J. Dec. 16, 2010) (citing *Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir. 2001). Rather, "the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Id.* (citing *Anderson,* 477 U.S. at 256-57). Accordingly, summary judgment will generally be granted unless a reasonable jury could render a verdict for the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 247-48.

A court must not resolve disputed facts or weigh the evidence and may not make determinations of credibility. *Russell v. Microdyne Corp., 65 F .3d* 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and to have

all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, as noted above, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp.2d 751 (N.D.W. Va. 2000).

## III.    DISCUSSION

### A.    Fourth Amendment excessive force and bystander liability claims.

The undersigned begins with Plaintiff's allegations in the Amended Complaint that Defendants used constitutionally excessive force against him during the vehicle pursuit and his subsequent arrest, which Defendants have labeled as "Count I." (ECF No. 81 at 2; ECF No. 119 at 4). When an excessive force claim arises out of the seizure of a free person, the Fourth Amendment provides the essential safeguards. *Graham v. Conner*, 490 U.S. 386, 395 (1989) (explaining that "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person."). The test for whether the force employed to accomplish a seizure is excessive is one of "objective reasonableness under the circumstances[,]" requiring "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 399.

Thus, the focus is on the reasonableness of the conduct when the force is used, recognizing that officers are often required to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Id.* at 396. Such consideration must be made "'in full context, with an eye toward the proportionality of the force in light of all the circumstances.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). Thus, the Court looks to "<u>what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception and have acted in like fashion</u>." *Lee v. City of Richmond*, 100 F. Supp.3d 528, 541 (E.D. Va. 2015) (citing *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)) (emphasis added).

The Supreme Court has recognized that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Nonetheless, "[b]ecause deadly force is extraordinarily intrusive, it takes a lot for it to be reasonable." *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019), *citing Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched.")

1.     Vehicle pursuit.

It is undisputed that Plaintiff led officers on a reckless and often high-speed chase in bad weather and through populated areas where he placed himself, the officers, and the public in imminent danger. Although Plaintiff testified that he did not recall the route he took or any of his specific actions during the pursuit (ECF No. 133-1 at 18-20), Defendant Beckner's Case Detail Report specifies as follows:

I observed the suspect vehicle fail to obey the traffic control device and make a turn Southbound onto Walnut Street. I activated my blue lights and siren at the intersection of Grant Avenue and Walnut Street and the Defendant Jeremy Colton Light continued southbound passing multiple side streets and parking lots. Mr. Light turned Westbound onto Washington Avenue to turn Northbound onto Vine Street failing to obey the stop sign. Mr. Light turned Eastbound on Wilson Avenue and turned off the lights on the motorcycle. Mr. Light continued onto Walnut Street and continued to flee Northbound to MacCorkle Avenue. Mr. Light continued Westbound onto MacCorkle Avenue running the red light at 5th Street. Multiple vehicles came to a complete stop to avoid a collision.

Mr. Light made a turn Northbound onto Center Street Bridge. Mr. Light continued to flee eastbound onto Route 25, often times entering the opposing lane of traffic, passing vehicles on the left until entering I64 at Institute. Mr. Light passed multiple vehicles exceeding the posted speed limit and abruptly exited the interstate from the fast lane at Dunbar causing multiple vehicles to [brake] abruptly to avoid a collision.

Mr. Light ran the red light at the bottom of the Dunbar exit ramp and the red light at 10th Street and Dunbar Avenue. Mr. Light continued to flee onto the Dunbar Toll Bridge[.]

(ECF No. 118, Ex. 2 at 9).

Plaintiff has not genuinely disputed these facts, and, during his deposition, he admitted that he fled and had no intention to yield to the authority of the officers. (ECF No. 133-1 at 17, 20-21). Nonetheless, he alleges that Defendant Beckner "used his police vehicle and rammed my motorcycle causing me to crash." (ECF No. 81 at 2, ¶ 1). Plaintiff's motion for summary judgment further asserts that Beckner "failed to maintain any reasonable distance" and "continued to force/push the motorcycle completely around the turn." (ECF No. 122 at 13). He further contends that SAPD policy, which does not specify a separate procedure or specific distance to maintain for pursuit of motorcycles in police cruisers, is constitutionally unreasonable and constitutes "deadly force" that was excessive for a mere "traffic violation." (*Id.* at 12-14). He further summarily contends that Beckner acted with "malicious purpose, in bad faith, in violation of clearly established

law, or in a wanton or reckless manner[.]"  (*Id.* at 14-15).[4]

Although Beckner disputes that he rammed Plaintiff's motorcycle - instead asserting that Plaintiff merely slid into and "bumped" his vehicle as he was already crashing his motorcycle - Defendants contend that this is not a material dispute of fact because the Fourth Circuit has previously found similar conduct to be objectively reasonable under the circumstances.  (ECF No. 125 at 8-10).  They rely on the Fourth Circuit's decision in *Abney v. Coe*, 493 F.3d 412 (4th Cir. 2007), in which a police officer struck a fleeing motorcycle, in violation of a police department policy, to end the pursuit, which resulted in the fleeing suspect's death.  The plaintiff therein argued that this was an unreasonable use of force in violation of the Fourth Amendment and that it contravened department policy.  *Id.* at 419.  However, the Fourth Circuit rejected that argument, finding that "violation of departmental policy does not equate with constitutional unreasonableness."  *Id.*  Therefore, Defendants assert that 'Plaintiff's reliance on the [SAPD] policies, procedures, or third-party training materials . . . is simply misplaced and cannot support his constitutional claims.'"  (ECF No. 125 at 6).

Significantly, the *Abney* Court further found that "the record [therein] [was] replete with examples of reckless driving designed to elude the police and executed with little consideration for the lives and safety of other motorists" and that such behavior "put

---

[4] Plaintiff's motion documents also assert that Defendants' conduct violated various state statutes, specifically W. Va. Code §§ 17C-2-5, 61-2-9 and 61-5-28.  (ECF No. 122 at 14-15, 19, 23).  However, violations of state law do not implicate any constitutionally protected right and are not independently actionable under § 1983.  *See Weller v. Dep't of Social Serv.*, 901 F.2d 387, 392 (4th Cir. 1990) (finding that violations of state law by state officials do not provide basis for constitutional claims under § 1983; *see also Carter v. Collins*, No. 7:22-cv-00025, 2023 WL 3871718, at *2 (W.D. Va. June 7, 2023) (alleged violations of state law are not redressable under § 1983).  Nor is there any private right of action granted by those statutes. Thus, the undersigned will not further address those allegations herein.

other motorists at substantial risk of serious harm." 492 F.3d at 417. Consequently, the Court found that it was "eminently reasonable to terminate the chase in order to avoid further risks to the lives of innocent motorists." *Id.* The *Abney* Court relied on the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), in which the Court "la[id] down [the] sensible rule" that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Id.*, quoting *Scott*, 550 U.S. at 386.

Defendants assert that, as in the instant case, there was a factual dispute in *Abney* about whether the contact between the motorcycle and the police vehicle was intentional or not. (ECF No. 125 at 8). Nonetheless, the appellate court essentially found that the factual dispute was not material because, even taking the facts in the light most favorable to the plaintiff and presuming that the act was intentional, it was still objectively reasonable under the circumstances. (*Id.* at 9). Defendants herein contend that "*Abney* squarely addresses the issues presented by this case with respect to the initial police pursuit and alleged 'bump.'" (*Id.*) Defendants further assert:

> Officer Beckner sought to initiate a traffic stop of Plaintiff for "fail[ing] to obey [a] traffic control device." [Footnote omitted]. Despite Officer Beckner initiating his lights and siren, Plaintiff continued his flight failing to abide by other traffic control devices at: (1) Washington Ave/Vine Street; (2) MacCorkle Avenue/5th Street; (3) the Dunbar exit off of Interstate 64; and (4) 10th Street/Dunbar Avenue. [Footnote omitted]. In addition to failing to abide by traffic control devices, Plaintiff turned off the lights to his motorcycle at approximately 9:45 P.M. [Footnote omitted]. Further, Plaintiff also created near-miss accidents on two occasions; first at the intersection of 5th Street and MacCorkle Avenue and again when he exited Interstate 64 at Dunbar, while it was sleeting/snowing, according to Plaintiff. [Footnote omitted]. Indeed, during this multi-jurisdictional flight, Plaintiff exceeded the posted speed limit and entered the opposing lane of traffic. [Footnote omitted]. For his actions during the subject pursuit, Plaintiff was indicted and pled guilty to a felony charge of Fleeing

with Reckless Indifference to the Safety of Others.

(ECF No. 125 at 9-10) (citing to Case Report Detail, ECF No. 125, Ex. 1). Defendants argue that "based upon the Fourth Circuit's analysis in *Abney*, the record taken as a whole indicates that Officer Beckner's actions – whether intentional or incidental – would be constitutionally reasonable." (*Id.* at 10). Thus, Defendants appear to be making an argument for qualified immunity that, although not specifically asserted in their initial motion for summary judgment, was raised both in their response to Plaintiff's motion and their reply brief. The undersigned construes Defendants' argument to be asserting that they are entitled to qualified immunity based on Plaintiff's failure to demonstrate a Fourth Amendment violation under the clearly established authority in *Scott* and *Abney*.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To overcome this shield, a plaintiff must demonstrate that: (1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the alleged violation." *Id.* "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (internal quotation marks and citations omitted); *see also Honaker v. Town of Sophia*, 184 F. Supp. 3d 319, 328-29 (S.D.W. Va. 2016).

Thus, qualified immunity is available unless the defendant "knew or reasonably should have known that the action he took within his sphere of official responsibility

would violate the constitutional rights of the plaintiff[,]" *Harlow*, 457 U.S. at 815, and it "shields officials from liability even where they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right." *Pearson*, 555 U.S. at 231-32. Applied properly, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). Therefore, "[a] police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (emphasis in original).

The undisputed facts of this case demonstrate that Plaintiff's flight from law enforcement put other motorists at risk of serious harm under similar circumstances to those in *Abney* where the Court found that an intentional bump of the fleeing suspect's motorcycle to end the pursuit was objectively reasonable. Both *Scott* and *Abney* were decided fourteen years before the instant vehicle pursuit and the holdings therein were sufficiently clear to allow a reasonable official to understand whether his conduct violates the Fourth Amendment.

Thus, even taking the evidence in the light most favorable to Plaintiff and presuming that Beckner "rammed his motorcycle causing it to crash[,]" under the clearly established precedent in *Scott* and *Abney*, the undersigned proposes that the presiding District Judge **FIND** that such conduct was objectively reasonable under the circumstances. Therefore, the dispute between the parties concerning whether the contact between Beckner's cruiser and Plaintiff's motorcycle was intentional or incidental is not material and Beckner is entitled to qualified immunity on this Fourth Amendment claim. Consequently, with respect to this specific Fourth Amendment claim, Defendants,

not Plaintiff, are entitled to judgment as a matter of law.

2.    Use of physical force and tasers.

Plaintiff further alleges that, after he crashed his motorcycle, he was laying on the ground when Defendants Truitt, Burdette, Cabell, and Beckner "began continuously punching, stomping, kicking, and tasing [him] violently during the arrest." (ECF No. 81 at 2, ¶ 2). The Amended Complaint further specifies that Defendants Burdette and Beckner "tased" him "while [he] was lying on the ground being assaulted." (*Id.*, ¶ 3). However, there are genuine issues of material fact as to whether Plaintiff was resisting arrest by pulling his arms to his sides and under his torso to avoid being handcuffed,[5] resulting in a reasonable use of force by Defendants to gain his compliance, or whether he did so to protect himself from unreasonable blows that these Defendants were allegedly administering without provocation. There are also genuine issues of material fact as to whether Defendants were aware that Plaintiff possessed at least one pocketknife and the location of that knife or other weapons at that time. Finally, there appear to be genuine issues of material fact as to whether Plaintiff was conscious throughout this incident.

Defendants contend that, "[o]nce the pursuit of Plaintiff terminated, [he] continued to obstruct efforts to effectuate his arrest." (ECF No. 125 at 11). Their motion for summary judgment asserts that "Plaintiff admits that he refused to present his hands

---

[5]  Plaintiff's motion documents contend, based upon a "Call for Service Detail Report" produced in discovery, that he was already "detained" at the time this physical force was used. (ECF No. 122 at 17-18 and ECF No. 122-1 at 56 (Ex. 2)). However, other than this one line of the report by an unidentified officer who allegedly radioed to dispatch at 9:54:42 that "Per DB105 ONE DETAINED," Plaintiff offers no further support for this contention. During his deposition, Plaintiff testified that he could not remember whether he was handcuffed while on the ground or after they lifted him up, but he acknowledged that he could not testify that any force was used after he was handcuffed and he admitted that he was not handcuffed at the time he was tasered. (ECF No. 133-1 at 31, 36).

to be handcuffed" and "does not deny that he was in possession of a knife, which was observed by officers to be accessible in the chest area pocket of his coveralls – near where [he] was concealing his hands." (ECF No. 119 at 7; ECF No. 118, Ex. 3 at 3-4; Ex. 5 at 3). Consequently, Defendants contend that any use of physical force, including the use of tasers by Beckner and Burdette, was objectively reasonable due to Plaintiff's resistance and continued threat to the officers. (ECF No. 119 at 7; ECF No. 125 at 12-13). They further contend that "Plaintiff must provide evidence that no objectively reasonable law enforcement officers facing the same totality of circumstances could possibly have concluded that any less force would have safely effectuated Plaintiff's arrest" and they argue that "Plaintiff has not done so." (*Id*. at 13).

Plaintiff, on the other hand, asserts that, while still on the ground after the crash, a male officer came up and struck him, which caused him to draw his arms close to his side to protect himself from the blows being administered. (ECF No. 133-1 at 29, 33-34). He further testified that he remembered "getting either kicked or punched, and that caused him to blackout." (*Id*. at 28). Then, he said: "I got kicked or punched several times. I was hit in the ribs. That's what caused me to keep my arms under me. I remember getting hit in the face, and I remember getting tased." (*Id*. at 29).

Beckner and Burdette both admit that they used their tasers on Plaintiff. Burdette states that she deployed her taser twice; however, she believed both attempts were ineffective due to the thick clothing Plaintiff was wearing. (ECF No. 118, Ex. 4, INT 1; Ex. 6, INT III). Plaintiff could only remember being tased once. He testified: "I remember coming to, somebody saying stop, stop, stop, tase him, tase him, tase him. And then I was – I remember getting tased that time." (ECF No. 133-1 at 30). He added, "As soon as I got tasered, I got either kicked or punched again and went unconscious again." (*Id*.)

15

Plaintiff's motion for summary judgment states:

> The evidence shows that once the pursuit had ended, Defendants C.A. Beckner, Lt. Truitt, Andrew Cabell, [and] Burdette did knowingly and intentionally apply an unreasonable and excessive amount of force by physically and brutally "striking (punching, kicking, stomping, and tasing) the plaintiff repeatedly, with malicious intent while plaintiff was lying on the ground during the arrest.

(ECF No. 122 at 21).  He further contends that the evidence demonstrates "severe swelling, bruising, cuts, blood, etc. all over the sides and front of [his] head [] which is a result of the defendants' actions." (*Id.*)  Although there is some confusion in Plaintiffs testimony about the type of helmet he was wearing that night, pictures taken at the scene depict a "full face helmet" that "would cover all parts of the head from front to back[.]" (*Id.* at 22, 75-76 (SAPD pictures of Plaintiff)).  Plaintiff's motion further contends that such a helmet "renders it impossible to have inflicted these damages from any other way . . . . (*Id.*)  Thus, Plaintiff asserts that the pictures of his injuries are "consistent with [his] claims of being brutally beaten while lying on the ground." (*Id.*)  He further asserts that Beckner's report "admits to striking the plaintiff" with a "closed fist." (*Id.*, citing ECF No. 122, Ex. 13).

The undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact concerning whether the Defendants' alleged use of physical force by striking (punching, kicking, and stomping) Plaintiff and Defendants Beckner and Burdette's deployment of tasers on Plaintiff were objectively unreasonable.  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that Plaintiff's Fourth Amendment claims against all Defendants concerning this alleged conduct should be decided by a jury and, therefore, the parties' cross-motions for summary judgment should be denied with respect to these Fourth Amendment claims.

3.    Bystander liability/failure to intervene claims.

Law enforcement officials who witness constitutional violations have "an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers[.]" *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002) (quoting *Anderson v. Branen*, 17 F.3d 552 F.3d 552, 557 (2d Cir. 1994)). (ECF No. 119 at 8). As further noted by the *Randall* Court, "such a duty attaches when an officer observes or has reason to know that 'a constitutional violation [is being] committed' by other officers and possesses 'a realistic opportunity to intervene to prevent the harm from occurring." *Id.* This is also known as "bystander liability." Plaintiff's Amended Complaint, liberally construed, alleges that "all defendants" failed to intervene when unconstitutionally excessive force was used against him. (ECF No. 81 at 2, ¶ 13)

Defendants' motion for summary judgment asserts that "Plaintiff has failed to establish any [constitutional] violation whatsoever that could trigger a duty to intervene as to any Defendant" and "has not established who allegedly failed to intervene." (ECF No. 119 at 8). Therefore, they contend that they are entitled to summary judgment on this claim. (*Id.*)

Plaintiff's motion for summary judgment, however, specifies that "Defendants Beckner, Burdette, Cabell and Truitt's actions and/or omissions violated their duty to uphold the law and protect the public from illegal acts, regardless of who commits them." (ECF No. 122 at 23). His response in opposition to Defendants' motion further asserts that "all Def[endants] physically beat Plaintiff" and each of the named Defendants "was present and failed to intervene when Def[endants] Beckner and Burdette tased Plaintiff multiple times while being detained." (ECF No. 127 at 4).

Based upon the finding that there are genuine issues of material fact concerning the uses of force against Plaintiff after he crashed his motorcycle, the undersigned proposes that the presiding District Judge **FIND** that there are also genuine issues of material fact concerning Plaintiff's failure to intervene claims under the Fourth Amendment arising out of the same conduct that should also be determined by a jury. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the parties' cross-motions for summary judgment should be denied on this basis.

B.    Fourteenth Amendment claims.

Plaintiff's Amended Complaint also asserts that Defendants' conduct violated the Fourteenth Amendment to the United States Constitution. (ECF No. 81 at 2, ¶ 5). The Fourteenth Amendment governs excessive force claims for pre-trial detainees after they have been officially taken into custody and the standard applied thereunder is still one of objective reasonableness. *See Kingsley v. Hendrickson*, 576 U.S. 389, 397-98 (2015). However, Plaintiff has conceded that no force was used against him after he was handcuffed and taken into custody. Thus, any Fourteenth Amendment claim concerning the use of excessive force herein fails or is duplicative of Plaintiff's Fourth Amendment claims.

The United States Supreme Court has held that, where a constitutional claim is covered by a specific constitutional provision—here, the Fourth Amendment—the claim must be analyzed under the standard applicable to that specific provision rather than "under the rubric of substantive due process" under the Fourteenth Amendment. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). Likewise, in *Graham*, *supra*, the Supreme Court specifically held that "all excessive force claims during an arrest are governed by the reasonableness standard under the Fourth Amendment, not a substantive due process

18

approach under the Fourteenth Amendment.  490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

Thus, "[i]t is well established in this district that 'claims of excessive force are more appropriately analyzed under the more textually specific Fourth Amendment . . . than the more generalized due process clause.'" *Meade v. Mynes*, No.: 2:19-cv-00647, 2020 WL 3697974, at *3 (S.D.W. Va. July 6, 2020) (quoting *Krein v. W. Va. State Police*, No. 2:11-cv-00962, 2012 WL 2470015, at *6 n.6 (S.D.W. Va. June 27, 2012)).  As discussed above, there are genuine issues of material fact about whether Defendants unreasonably seized him in violation of the Fourth Amendment when they allegedly used excessive force against him during his arrest that must be decided by a jury.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that, because Plaintiff's surviving excessive force constitutional claims are governed by the Fourth Amendment, his duplicative claims under the Fourteenth Amendment in Count I must be dismissed as a matter of law.

Defendants also construe Plaintiff's Amended Complaint to be raising a Fourteenth Amendment claim stemming from the alleged denial of medical treatment to Plaintiff once he was in custody, which they label as "Count V" (and which the Amended Complaint appears to call "deliberate indifference").  (ECF No. 81 at 2, ¶ 10; ECF No. 119 at 4, 9-10).  Defendants assert, however, that "Plaintiff has not established a Fourteenth Amendment deliberate indifference claim."  (ECF No. 119 at 9).  In support of this claim, Plaintiff testified at his deposition that "[t]hat there [were] no EMTs" at the scene and

that he "was never offered any medical treatment until several hours later[.]" (ECF No.
133-1 at 41). Defendants, on the other hand, maintain that Plaintiff admittedly refused
medical treatment when he was subsequently taken to the hospital and, thus, they assert
that this claim is "contradicted by his own testimony." (ECF No. 119 at 9; ECF No. 133-1
at 42). In response to this assertion, Plaintiff contends that he "didn't feel safe" because
Defendant officers were still with him at that time. (ECF No. 133-1 at 43).

 As noted by Defendants in their motion documents, the Fourth Circuit considers a
pre-trial detainee's claims concerning needed medical treatment under the Fourteenth
Amendment. *Short v. Hartman*, 87 F.4th 593, 608 (4th Cir. 2023). (ECF No. 119 at 9-
10). In *Short*, the Court laid out the following elements of such a claim:

> [A] pretrial detainee must plead that (1) they had a medical condition or
> injury that posed a substantial risk of serious harm; (2) the defendant
> intentionally, knowingly, or recklessly acted or failed to act to appropriately
> address the risk that the condition posed; (3) the defendant knew or should
> have known (a) that the detainee had that condition and (b) that the
> defendant's action or inaction posed an unjustifiably high risk of harm; and
> (4) as a result, the detainee was harmed.

87 F.4th at 611. The Court describes the threshold essential conduct as being "objectively
unreasonable." *Id.*

 Defendants contend that "Plaintiff has not developed evidence as to any element
of deliberate indifference. In fact, Plaintiff concedes that he refused treatment when Ptlm.
Beckner took him to the hospital." (ECF No. 119 at 10). They further assert that the
evidence likewise demonstrates that Plaintiff again refused medical treatment once he
arrived at the SCRJ. (*Id.*; ECF No. 133-1 at 42-44). Accordingly, they contend that they
are entitled to summary judgment on this Fourteenth Amendment claim. (ECF No. 119
at 10).

In support of this claim, Plaintiff's motion for summary judgment asserts that "all defendants violated policy and did not follow protocol and immediately contact medical services.  None were offered until several hours later, despite having endured severe and critical injuries until 12:11:55 which was on 12-19-2021."  (ECF No. 122 at 22).  His response to Defendants' motion again asserts that he "was not offered medical attention immediately at the incident."  (ECF No. 127 at 10).  The response further contends that, based upon the pictures of his face taken after the incident, "it is clear[] that medical services should have been immediately contacted [but] no medical services were offered until several hours later."  (*Id.*)  Plaintiff further asserts that "E.M.S. should have been immediately dispatched for safety reasons" when his motorcycle was struck by Beckner's vehicle.  (*Id.*)

Notwithstanding the pictures of Plaintiff's alleged facial injuries, Plaintiff has not established that he suffered any injury that constituted a serious medical need requiring immediate attention at the scene.  Moreover, when he was offered medical treatment later that night, he refused it.  Consequently, Plaintiff cannot demonstrate that, on the night in question, any of the Defendants knew or should have known that he had a medical condition or injury that posed a substantial risk of serious harm, and that any Defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed, which resulted in actual harm to Plaintiff.  Therefore, he has not demonstrated that Defendants' conduct was objectively unreasonable. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has failed to establish any Fourteenth Amendment violation based upon the denial of medical treatment on the night in question and that Defendants, not Plaintiff, are entitled to judgment as a matter of law on this claim.

C.     State law assault and battery claims.

Plaintiff also asserts that the Defendants' conduct constituted an assault and battery under state law, which Defendants labeled as "Count VI." (ECF No. 81 at 2, ¶ 12; ECF No. 119 at 4). Under West Virginia common law, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *W. Va. Fire & Cas. Co. v. Stanley,* 602 S.E.2d 483, 494 (W. Va. 2004). An assault under West Virginia common law holds that "[a]n actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." *Id.* at 495.

Defendants argue that "[a] defendant can avoid liability for [these state law tort claims] if he is otherwise privileged to engage in the complained of conduct." (ECF No. 119 at 7, quoting *Nutter v. Mellinger*, No. 2:19-cv-00787, 2021 U.S. Dist. LEXIS 188511, at *19 (S.D.W. Va. Sept. 30, 2021) (quoting *Hutchinson v. W. Va. State Police*. 731 F. Supp. 2d 521, 547 (S.D.W. Va. 2010) and *Graham*, 490 U.S. at 396). Based upon their assertion that the use of force against Plaintiff was reasonable under the circumstances, Defendants contend that they were "privileged to engage in the complained of conduct" and, thus, are entitled to judgment as a matter of law on Plaintiff's state law tort claims of assault and battery. (*Id.*)

However, the facts supporting these state law civil claims arise out of the same conduct as Plaintiff's Fourth Amendment excessive force claims. Because the undersigned has found that there are genuine issues of material fact concerning the

Fourth Amendment claims, the undersigned further proposes that the presiding District Judge similarly **FIND** that there are genuine issues of material fact concerning Plaintiff's state law civil assault and battery claims against the Defendants that preclude summary judgment for any party and that these claims should be determined by a jury.

> D.    State law intentional infliction of emotional distress claim.

Plaintiff's Amended Complaint also summarily alleges a claim for "mental and emotional distress" as well as "pain and suffering." (ECF No. 81 at 2, ¶ 7). Defendants have construed these bare allegations as raising a state law claim of intentional infliction of emotional distress ("IIED"), and labeled the same as "Count III." (ECF No. 119 at 4). In Syllabus Point 6 of *Harless v. First Nat. Bank in Fairmont*, 289 S.E.2d 692, 694 (W. Va. 1982), the Supreme Court of Appeals of West Virginia (the "SCAWV") held that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Such a claim is also known as the "tort of outrage." *Id.* at 703. To establish an IIED or tort of outrage claim, the plaintiff must prove the following:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendants acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998). As previously noted by the SCAWV, whether the complained-of conduct is legally outrageous is a question of law to be decided by the trial court. *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d

395, 404 (W. Va. 2008).  To be legally outrageous, the conduct must be "more than unreasonable, unkind, or unfair; it must truly offend community notions of acceptable conduct."  *Travis*, 504 S.E.2d at 425.

The circumstances in which liability for IIED has been imposed are extremely rare, and "firm judicial oversight is required in order to avoid losing control over the tort."  *See Hines v. Hills Dep't Store,* 454 S.E.2d 385 (W. Va. 1994) and *Johnson v. Hills Dep't Store*, 488 S.E.2d 471, 476 (W. Va. 1997).  The standard is so stringent that it is not enough even when a defendant "acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle" a plaintiff to punitive damages in another tort claim.  *Harless*, 289 S.E.2d at 704-705.

Both parties' motions for summary judgment assert that they are entitled to judgment as a matter of law on the merits of this claim.  (ECF No. 119 at 7-8; ECF No. 122 at 19-20; ECF No. 127 at 9).  However, Plaintiff's state law IIED claim is duplicative of his state law claims for assault and battery because it seeks damages for mental and emotional distress caused by the force allegedly used by Defendants.  The SCAWV has long held that "[b]ecause an action for assault and battery allows for recovery of damages due to resulting emotional distress, a claim for the tort of outrageous conduct [also known as IIED] is duplicitous of claim for assault and battery where both claims arise from the same event."  Syl. Pt. 4, *Criss v. Criss*, 356 S.E.2d 620 (W. Va. 1987)); *see also* Syl. Pt. 7, *Harless*, 289 S.E.2d 692 (a plaintiff "may not recover damages twice for the same injury simply because he has two legal theories").

This legal principle has been repeatedly employed by judges of this court in dismissing IIED claims as duplicative where an assault and battery claim arising out of

the same conduct is also plead in a complaint. *See Pearson v. Thompson*, No. 2:19-cv-00321, 2019 WL 4145613, at *2 (S.D.W. Va. Aug. 29, 2019) ("[T]he Supreme Court of Appeals of West Virginia's decisions in *Harless* and *Criss* and the application of the legal principles established in those cases by that Court and this District demonstrate that a plaintiff may not plead claims that give rise to duplicative damages even at the motion to dismiss stage."); *Kelly v. W. Va. Reg'l Jail & Corr. Facility Auth.*, No. 2:18-cv-01074, 2019 WL 2865863, *3 (S.D.W. Va. July 2, 2019) (dismissing IIED claim as duplicative of assault and battery claim under West Virginia law); *Searls v. W. Va. Reg'l Jail,* No. 3:15-cv-9133, 2016 WL 4698547, *4 (S.D.W. Va. Sept. 7, 2016). Accordingly, because Plaintiff can properly seek his claim for such damages through his assault and battery causes of action, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff's IIED claim contained in Count III of the Amended Complaint must be dismissed as duplicative.

E.      Section 1985 conspiracy claim.

The claim labeled by Defendants as Count II of Plaintiff's Amended Complaint asserts that Defendants' conduct constituted a conspiracy in violation of 42 U.S.C. § 1985; however, his allegations in support of this claim are wholly conclusory, stating: "All defendants and current defendant Patrolman C.A. Beckner – (section 1985 claim)." (ECF No. 81 at 2, ¶ 4; ECF No. 119 at 4). Nonetheless, liberally construing the Amended Complaint, the undersigned reads Plaintiff's claim to be alleging that the named defendants conspired to violate Plaintiff's civil rights by using excessive force against him.

Section 1985 contains three distinct subsections and, as Defendants note, "Plaintiff has not indicated under which of the three categories he is pursuing his claim." (ECF No.

25

125 at 20). Of those, however, only § 1985(3) could have any application herein.[6]  To establish a § 1985(3) claim for deprivation of civil rights, Plaintiff must prove the following elements:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Simmons v. Poe,* 47 F.3d 1370, 1376 (4th Cir. 1995).

It is well settled that a § 1985 conspiracy claim requires a showing of "an agreement or a 'meeting of the minds' by Defendants to violate the [Plaintiff]'s constitutional rights." *Simmons*, 47 F.3d at 1377 (citing *Caldeira v. County of Kauai*, 866 F.2d 1175, 1181 (9th Cir. 1989)).  Defendants aptly note that the Fourth Circuit "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a § 1985 conspiracy." *Id*. at 1377.  (ECF No. 129 at 16).  Where a conspiracy is alleged in a conclusory manner, the Fourth Circuit has found that the claim fails.  *Id*.; *see also Sellner v. Panagoulis*, 565 F. Supp. 238, 248 (D. Md. 1982) (finding that the plaintiff's section "1985 claims fail because he has alleged the existence of conspiracies in only the most conclusory way and has not supported his allegations of conspiracy by reference to material facts.").

Additionally, "where a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy . . . . Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of

---

[6] Subsection (1) of section 1985 concerns conspiracies to prevent a person from holding or discharging the duties of any office, trust, or place of confidence.  42 U.S.C. § 1985(1).  Subsection (2) concerns conspiracies to prevent a person from attending or testifying in a court proceeding or influencing a "verdict, presentment, or indictment" of a jury.  42 U.S.C. § 1985(2).  The facts of this case do not invoke either of those sections.

agreement at some unidentified point does not supply facts adequate to show illegality.'" 655 F,3d at 346 (quoting *Twombly*, 550 U.S. at 556-57 (reasoning that allegations of parallel conduct were insufficient to state a claim for a conspiracy under the Sherman Act)). The Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id.* Moreover, "§ 1985(3) provides relief only when the conspiracy is designed to deprive a person of equal protection or equal privileges and immunities under the laws." *Rhodes v. Smithers*, 939 F. Supp. 1256, 1271 (S.D. W. Va. 1995). "Consequently, subsection 1985(3) concerns only those conspiracies which are motivated by some racial or other class-based 'invidiously discriminatory animus.'" *Id.*

Here, Defendants assert that "Plaintiff has not developed evidence as to how he could satisfy any of the above elements." (ECF No. 119 at 9). They further contend that "[t]he record contains no facts indicating a conspiracy among any Defendants, any discriminatory animus or objective, or any overt acts taken toward such an end." (*Id.*) Thus, they assert that they are entitled to judgment as a matter of law on this claim.

Plaintiff only summarily asserts that the "defendants' failure to intervene when Plaintiff was being tased by multiple people multiple times after being detained as well as failing to intervene while Plaintiff was being physically struck . . . is also evidence which supports all defendants are liable for claim of conspiracy[.]" (ECF No. 127 at 9). His response further states:

> 42 U.S.C. § 1985 – relating to being physically beaten by the officers which did deprive Plaintiff of his constitutional rights [to] "equal enjoyment" secured by the law to all, which resulted in injury as the consequence of an overt act committed by the defendants in connection with the conspiracy. Also, Def. Burdette and Beckner when tasing the Plaintiff . . . .

(*Id.* at 9-10).

27

Defendants' reply brief, however, aptly asserts that "Plaintiff's conspiracy-based claims simply allege that a conspiracy exists, without any specific facts that the Defendants conspired, in any way, against Plaintiff." (ECF No. 129 at 16). Moreover, Plaintiff's filings do not even address the absence of class-based discriminatory animus. As noted by Defendants, "Plaintiff has not identified which class he is a member of, nor what discriminatory animus he suffered as a member of that class." (*Id.*)

The undersigned agrees that Plaintiff has failed to allege and demonstrate the requisite discriminatory animus or any actual agreement among conspirators to establish a section 1985 conspiracy. *See Est. of Green v. City of Annapolis*, 696 F. Supp.3d 130, 162 (D. Md. 2023). Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff's § 1985 conspiracy claim fails as a matter of law, and Defendants, not Plaintiff, are entitled to judgment as a matter of law thereon.

F.    Civil conspiracy claim.

To the extent that Plaintiff has also alleged a civil conspiracy claim under § 1983 or state law, he has a "weighty burden" to demonstrate an agreement or common plan among the defendants, which he has not done. *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996). To establish a § 1983 civil conspiracy, a plaintiff must prove that two or more persons were acting jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in the deprivation of a constitutional right. While Plaintiff does not need to "produce direct evidence of a meeting of the minds, [he] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* "The essence of a conspiracy is an agreement between two or more persons to accomplish an unlawful purpose." *Precision Piping & Instruments, Inc. v. E.I. duPont De Nemours & Co.*, 707 F.

Supp. 225, 229 (S.D.W. Va.1989); *see also Tucker v. Thomas*, 853 F. Supp. 2d 576, 594 (N.D.W. Va. 2012).

Additionally, under West Virginia law, "[a] civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Syl. Pt. 8, *Dunn v. Rockwell*, 689 S.E.2d 255, 259 (W. Va. 2009). A "civil conspiracy is not a stand alone cause of action, but is 'a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s).'" *Id.* at 269; *see also Bennett v. Skyline Corp.*, 52 F. Supp. 3d 796, 814 (N.D.W. Va. 2014).

Plaintiff merely speculates that Defendants had a meeting of the minds to act with a concerted purpose to use unnecessary force against him, which is insufficient to establish a civil conspiracy claim. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has not alleged or demonstrated facts leading to an inference of a conspiracy and, thus, Defendants, not Plaintiff, are entitled to judgment as a matter of law on this claim.

G.    Negligence claim.

The claim labeled by Defendants as "Count IV" of the Amended Complaint appears to summarily assert, in part, a state law negligence claim. (ECF No. 81 at 2, ¶ 9; ECF No. 119 at 4). However, the Amended Complaint provides nothing more than the following conclusory statement: "All defendants (negligence) (gross negligence) willful, wanton, and reckless misconduct," (ECF No. 81 at 2, ¶ 9), and Plaintiff offers no additional specific facts or explanation as to how any Defendant acted negligently. "A negligence claim in West Virginia requires a showing of duty, breach, causation, and damages." *Honaker,*

*supra*, 184 F. Supp. 3d at 325.  Significantly, such conduct is distinguishable from intentional or willful, wanton, and reckless misconduct, which is also alleged by Plaintiff.

The Fourth Circuit has held that intentional acts cannot form the basis of a negligence claim.  *See Smith v. Lusk*, 533 F. App'x 280, 284 (4th Cir. 2013).  Moreover, district courts within the Fourth Circuit have frequently granted dispositive motions filed by defendants on negligence claims brought on a theory of excessive force because an inference can be drawn therefrom that "the officers intended the consequences of their [use of force]" and, thus, such conduct could not have been negligent as a matter of law. *Honaker*, 184 F. Supp. 3d at 325 (citing *Weigle v. Pifer*, 139 F. Supp. 3d 760, 780 (S.D.W. Va. 2015) (Copenhaver, J.); *see also Marsh v. Garrett,* No. 1:24-cv-00048, 2025 WL 941018, at *4 (N.D.W. Va. Mar. 27, 2025) (Kleeh, C.J.) (allegations that a defendant's conduct was "reprehensible, willful and wanton, malicious, objectively unreasonable, and in blatant and intentional disregard of the rights owed to Plaintiff directly conflicts with a claim for negligence by stating that the actions were malicious and intentional — elements of intentional torts, not negligence."); *Crawford v. Daniels,* 2024 WL 1895105, at *8 (S.D.W. Va. Apr. 30, 2024) (Johnston, C.J.) (citations omitted) ("intentional torts and negligence are mutually exclusive"); *Greene v. Putnam Cnty. Comm'n*, No. 3:21-cv-0520, 2022 WL 16859755, at *10 (S.D.W. Va. Nov. 10, 2022) (Chambers, J.) (dismissing negligence claims grounded in "deliberate, willful, and intentional" conduct).

To the extent that Plaintiff has alleged that the individual Defendants herein acted negligently, Defendants contend that his claim fails because, as employees of a political subdivision, "they are immune unless they are acting outside the scope of their employment, acting with a malicious purpose, in bad faith, or in a wanton and reckless manner; or liability is expressly imposed by state code."  (ECF No. 119 at 10) (citing W.

30

Va. Code § 29-12A-5(b), known as the "West Virginia Governmental Tort Claims Act" or
""Tort Claims Act").  As further noted by Defendants' memorandum of law in support of
their motion for summary judgment:

> In *Beckley v. Crabtree*, the Supreme Court of Appeals of West Virginia
> noted that an employee of a political subdivision could not be held liable for
> simple negligence because simple negligence was not one of the exceptions
> to immunity for an employee of a political subdivision.  *Id.*, 189 W. Va. 94,
> 95, 428 S.E.2d 317, 318 (1993).  Plaintiff has asserted intentional torts
> against the individual Defendants that are addressed elsewhere herein.
> However, Plaintiff cannot sue the individual officers alleging that their
> purportedly intentional acts were negligent. Negligence is simply not the
> correct claim to bring in a use of force situation.

(ECF No. 119 at 10).

Plaintiff's motion for summary judgment and response to Defendants' motion
make it clear that he is also attempting to assert that the SAPD or City of St. Albans[7]
should be held "vicariously liable for the negligent actions of Defendants Burdette,
Beckner, Truitt, and Cabell." (ECF No. 122 at 9).  In support of that claim, Plaintiff relies
on another provision of the Tort Claims Act in W. Va. Code § 29-12A-4(c).  (*Id.* at 9-10).

Under the doctrine of *respondeat superior*,[8] an employer can be held vicariously
liable for the tortious acts of its employee committed within the scope of employment.
*See also* W. Va. Code § 29-12A-4(c)(2) (providing that an employer may be "liable for
injury, death, or loss to persons or property caused by the negligent performance of acts

---

[7] Plaintiff named the SAPD as a Defendant in his Amended Complaint.  (ECF No. 81).  Defendants waited
until the filing of their Response in Opposition to Plaintiff's Motion for Summary Judgment to argue for the
first time that the SAPD is not a suable entity because it "has no legal existence separate or independent
from the City of St. Albans."  (ECF No. 125 at 4 and n.13, citing W. Va. Code § 8-14-1) (other citations
omitted).  While the undersigned agrees that the City of St. Albans is the properly named defendant, the
undersigned further believes that the discovery responses, representations, and arguments made on behalf
of the SAPD are attributable to the City of St. Albans, which may be substituted as the proper defendant
herein.  From this point forward, the undersigned will refer to the municipal defendant as the City of St.
Albans.

[8] Because *respondeat superior* is inapplicable to federal constitutional claims under § 1983, *see Monell v.
v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), the undersigned analyzes only the Plaintiff's state law
negligence claims here.

by their employees while acting within the scope of employment."); *accord Barath v. Performance Trucking Co., Inc.*, 424 S.E.2d 602, 605 (W. Va. 1992) (holding "that if it can be shown that an individual is an agent and if he is acting within the scope of his employment when he commits a tort, then the principal is liable for the tort as well as the agent.").  However, while political subdivisions, like the City of St. Albans, may be "liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of employment", W. Va. Code § 29-12A-4(c)(2), they are immune to liability for the intentional acts of their employees.  *See Mallamo v. Town of Rivesville*, 477 S.E.2d 525, 533 (W. Va. 1996).

The evidence of record herein, even taken in the light most favorable to Plaintiff, would demonstrate that the individual Defendants acted intentionally, not negligently, in allegedly using excessive force against him and in allegedly committing the state law claims of assault and battery.  Accordingly, there can be no basis for individual negligence claims or vicarious liability against the City of St. Albans based on a theory of negligence.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that all Defendants are entitled to judgment as a matter of law on Plaintiff's simple negligence claim.

H.    Failure to train and municipal and supervisory liability claims.

Plaintiff's Amended Complaint also contains allegations suggesting that the City of St. Albans (through the SAPD) failed to properly train and supervise its officers.  In pertinent part, the Amended Complaint states:

15.    St. Albans Police Department fail[ed] to teach each patrolman/employee how to correctly promulgate vehicular pursuit policy.

32

16.    St. Albans Police Department has fail[ed] to deficiently [sic] and adequately train and educate its officers in the use of reasonable force and proper use of authority; repeatedly fail[ed] to adequately supervise the actions of officers and officials under their control and supervision; repeatedly fail[ed] to ensure the safety of individuals; and properly discipline supervisors who are not properly following policy of follow-up supervision of trainees.  Refusal to discharge or reassign officers for police brutality.

(ECF No. 81 at 2, ¶¶ 15-16).  Plaintiff also alleges that Defendant Truitt, as a supervisory official, should be held liable for this conduct.  (*Id*., ¶ 18).  As noted previously herein, Defendants couched these allegations as claims of negligent training and supervision, but then wholly addressed these claims under federal constitutional standards as set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) and *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), not state law negligence standards.[9]

Despite carelessly and possibly inaccurately labeling these allegations as negligence claims, Defendants' memorandum of law notes that "Plaintiff's Failure to Train, Supervisory Liability, and *Monell* claims are intertwined."  (ECF No. 119 at 11).  Their brief then goes on to analyze the claims under § 1983, stating:

---

[9] Under West Virginia law, claims of negligent training and supervision are not stand alone claims and are governed by general negligence principles. *See, e.g., Neiswonger v. Hennessey*, 601 S.E.2d 69, 73 (W. Va. 2004) (recognizing negligent hiring, training, and supervising as a cause of action grounded in state law and distinct from claims asserted under § 1983); *Taylor v. Cabell Huntington Hosp., Inc.*, 538 S.E.2d 719, 725 (W. Va. 2000) (treating negligent supervision like other claims based in negligence).  To establish a negligent supervision claim, a plaintiff must show "that the employer failed to properly supervise its employees and, as a result, those employees proximately caused injury to another." *Biser v. Mfrs. and Traders Trust Co*., 211 F. Supp. 3d 845, 856 (S.D.W. Va. 2016) (citing *Ferrell v. Santander Consumer USA, Inc.*, 859 F.Supp.2d 812, 817-18 (S.D.W. Va. 2012)).  As with general negligence, "the analysis centers on whether the employer was on notice of the employee's propensity (creating a duty), yet unreasonably failed to take action (manifesting a breach), resulting in harm to a third-party from the employee's tortious conduct." *Radford v. Hammons*, No. 2:14-cv-24854, 2015 WL 738062, at *7 (S.D.W. Va. Feb. 20, 2015) (citation omitted).  Neither Plaintiff nor Defendants analyzed the facts of this case under the elements of negligent training or supervision.  Thus, to the extent that Plaintiff is pursuing state law claims against the City of St. Albans or any individual Defendants for negligent training and negligent supervision, the undersigned proposes that the presiding District Judge **FIND** that such claims have been insufficiently addressed by the parties at this stage of the proceedings and there may be genuine issues of material fact concerning the essential elements of those claims.  Accordingly, neither Plaintiff nor Defendants are presently entitled to judgment as a matter of law on such claims.

> [T]he inadequacy of police training may serve as the basis for § 1983 liability
> only where the failure to train amounts to deliberate indifference to the
> rights of persons with whom the police come into contact.  This rule is most
> consistent with our admonition in *Monell*, . . . that a municipality can be
> liable under § 1983 only where its policies are the "moving force [behind]
> the constitutional violation."

(ECF No. 119 at 11, quoting *City of Canton v. Harris*, 489 U.S.378, 388-89 (1989) (quoting

*Monell*, *supra*, 436 U.S. at 694.

In *Monell*, the Supreme Court established that, to hold a municipality liable under

§ 1983, a plaintiff must prove that the municipality itself caused the plaintiff's injury

through the execution of government "policy" or "custom."  *Id*. at 691.  As noted by

Defendants, the Fourth Circuit has pronounced that such policy or custom may be

established in one of four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2)
> through the decisions of a person with final policymaking authority; (3)
> through an omission, such as a failure to properly train officers that
> "manifest[s] deliberate indifference to the rights of citizens"; or (4) through
> a practice that is so "persistent and widespread" as to constitute a "custom
> or usage with the force of law." (citation omitted).

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).  Defendants believe that Plaintiff is

attempting to establish his *Monell* claim based upon an alleged omission of proper

training resulting in deliberate indifference or based upon a "persistent and widespread"

use of excessive force by St. Albans police officers.  (ECF No. 125 at 14-15).  Their response

to Plaintiff's motion states, "Essentially, Plaintiff asserts that the City (and its officers)

have 'failed to properly investigate;' 'fail[ed] to train, supervise, etc.' and have not

'properly investiga[ed], disciplin[ed], or terminat[ed] other officers.'"  (*Id*., citing

Plaintiff's motion for summary judgment, ECF No. 122 at 8).  In pertinent part,

Defendants' motion documents assert that "Plaintiff cannot show that the City of St.

Albans was so *deliberately indifferent* to the '*persistent and widespread* . . . practices' of

34

excessive force by its police officers that it thereby established a policy or custom for those officers to use excessive force." (ECF No. 125 at 15).

Defendants also cite to the Fourth Circuit's decision in *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), which addresses the elements for a § 1983 claim grounded in supervisory liability for individual supervisors, like Truitt, and requires "(1) that the supervisor had actual or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." (ECF No. 119 at 11, n.12). Defendants further assert that "[t]he imposition of supervisory liability on a failure to train theory is merely a more specific formulation of the *Monell* 'official policy or custom/ inquiry wherein the official 'policy or custom' is the training program (or lack thereof)." (*Id.*, quoting *Brown v. Mitchell*, 308 F. Supp.2d 682, 702 (E.D. Va. 2004)). Therefore, Defendants contend that "Plaintiff's Failure to Train and Supervisory Liability claims are redundant in light of [his] *Monell* claim." (*Id.*)  In the alternative, Defendants assert that Plaintiff has failed to develop sufficient evidence to satisfy the requisite elements of either claim. (*Id.*)

Defendants first contend that, because Plaintiff has failed to establish any underlying constitutional violation by the individual defendants, there is no basis for *Monell* or supervisory liability.  However, because the undersigned has previously found that there are genuine issues of material fact concerning whether the individual defendants committed a Fourth Amendment violation based upon the force used against

Plaintiff after his motorcycle crash, the Court cannot accept this blanket assertion. Nonetheless, Defendants further argue that "Plaintiff still has not tied the use of force to a custom, policy, or failure to train." (ECF No. 119 at 12).

Plaintiff's Amended Complaint contains a conclusory allegation that the use of "excessive force during pursuits and arrests are persistent and widespread." (ECF No. 81 at 2, ¶ 14). He further summarily asserts a "failure to supervise" by Lieutenant Truitt. (*Id.*, ¶ 18). In support of these claims, Plaintiff's motion for summary judgment and response to Defendants' motion attempt to establish evidence of a City of St. Albans' policy or custom and actual knowledge of the same by Truitt by citing to a handful of other civil complaints alleging uses of excessive force by SAPD officers that have been filed either in this federal court or the Circuit Court of Kanawha County. Plaintiff's motion for summary judgment states that those exhibits "show multiple incidents similar to the incident in question [in] which multiple officers of St. Albans Police Department have physically struck individuals with their hands, fists, etc., unreasonably and excessively and have continued since the incident in question." (ECF No. 122 at 8 and Ex. 11 A-E). Plaintiff also cites to internal investigation documents produced during discovery in which a non-defendant officer "allegedly admits to repeatedly striking an individual multiple times in the face." (*Id.* at 8 and Ex. 12).[10] Plaintiff's motion documents assert that this evidence establishes "an 'unreasonable' and 'pervasive' risk of harm" stemming from "the same type of force which was used relating to [Plaintiff's] incident" and that "officers of the City/Department of St. Albans have failed to properly investigate and are

---

[10] Defendant Truitt was also allegedly on the scene during this traffic stop and assisted in the arrest of the driver.

continuing to allow officers who are applying excessive unreasonable amount of force . . . .” (ECF No. 122 at 7).

However, as noted by Defendants, several of the cases and the internal investigation upon which Plaintiff relies concern incidents that occurred after his own arrest.  Such evidence cannot support these claims, which require demonstration of conduct that occurred before Plaintiff's incident, such that it was so “widespread and persistent” that the violation of Plaintiff's rights was “almost bound to happen, sooner or later,” and that the supervisory Defendants' inaction in the face of such widespread conduct was a causative factor in the violation of Plaintiff's rights.  *Spell*, 824 F.2d at 1390; *see also Owens v. Baltimore Attorney's Office*, 767 F.3d 379, 403 (4th Cir. 2014).  (ECF No. 129 at 11-12) (other citations omitted).  Therefore, conduct that occurred after the Plaintiff's incident is immaterial herein.

Moreover, at this stage of the proceedings, Plaintiff cannot simply rely on the filing of the civil complaints as evidence demonstrating a widespread pattern or practice.  As argued by Defendants in their response to Plaintiff's motion, “those are *simply complaints*, not evidence of excessive force findings.”  (ECF No. 125 at 15, citing *Karwacki v. Columbia Gas Transmission, LLC*, No. 2:23-cv-00715, 2024 U.S. Dist. LEXIS 197653 at *6, 2024 WL 4629149, at *2 (S.D.W. Va. Oct. 30, 2024) (quoting *Askins v. Belissary*, No. 4:12-cv-1856-RBH, 2014 U.S. Dist. LEXIS 14783, 2014 WL 507279, at *7 (D.S.C. Feb. 5, 2014),  *aff'd,* 564 F. App'x 46 (4th Cir. 2014) (“Notably, ‘a plaintiff cannot rely on an unverified complaint’ because an ‘unsworn argument does not constitute evidence’ for summary judgment purposes.”)); *see also Roberts v. Coffee Cnty., Tenn.*, 826 F. App'x 549, 558 (6th Cir. 2020) (affirming summary judgment on *Monell* and supervisory liability claims where plaintiff merely relied on other complaints of excessive force

without any evidence to prove such claims were serious and not frivolous). Moreover, Defendants assert that none of the officers who are Defendants in the instant case were parties to the civil complaints relied on by Plaintiff. (ECF No. 125 at 16).

Plaintiff has not produced any evidence to demonstrate that the other cases he relies on have had affirmative findings of a use of excessive force that would affirmatively cause the City of St. Albans, or Lt. Truitt, as a supervisor, to have actual or constructive knowledge of a widespread pattern or practice of similar uses of excessive force prior to Plaintiff's incident, such that their inaction in response thereto proximately caused the violation of Plaintiff's rights. Therefore, he cannot rely on that evidence to satisfy the "stringent" *Monell* standard. *See Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact concerning Plaintiff's *Monell* and supervisory liability claims against the City of St. Albans and Lt. Truitt based upon a widespread and persistent custom, and that those Defendants, and not Plaintiff, are entitled to judgment as a matter of law on those claims.

Turning to the deliberate indifference based upon an omission or failure to train theory, Defendants further contend:

> The Defendant officers have all completed the requisite training required by West Virginia to be a certified police officer. [Footnote omitted]. Plaintiff has not developed evidence that any of the officers were untrained or uncertified. Plaintiff has no expert to argue that the City of St. Albans' policies or procedures are deficient. Plaintiff has failed to establish the alleged excessive force was caused by the City itself. Thus, Plaintiff's

Negligent Failure to Train, Supervisory Liability, and *Monell* claims fail as a matter of law.

(*Id.*)

Plaintiff has, however, offered evidence that Defendants Beckner and Burdette may not have been properly recertified to use tasers at the time they deployed their tasers against Plaintiff on December 18, 2021.  (ECF No. 122 at 1-6; ECF No. 127 at 1-2, 11-12).  During discovery, Defendants produced a PowerPoint outline from Axon Enterprises, Inc. that is allegedly used in training SAPD employees concerning the use of tasers.  The outline contains apparent guidelines from Axon, who is believed to be the manufacturer of the tasers used by the SAPD, which state in pertinent part:  "You MUST successfully complete the entire curriculum to be certified by TASER Training as a Taser energy weapon operator."  (ECF No. 122, Ex. 1 at 1).  The outline further states that "Operator certification is valid for one calendar year" and "Operators must be recertified annually or more frequently as necessary to stay current with updated manufacturer warnings and training."  (*Id.*)

Based upon the training records produced by Defendants during discovery, Defendant Beckner received a Certificate of Completion for "AXON Academy training for TASER Conducted Energy Weapon X2 CEW V.22 USER CERTIFICATION COUSE" on October 8, 2020, and did not recertify until December 30, 2021.  Thus, he did not recertify within one year of his prior training and was, therefore, not recertified in accordance with the guidelines on December 18, 2021, when he deployed his taser against Plaintiff.  (ECF No. 122 at 1-6 and Ex. 1 at 7).  Likewise, Defendant Burdette completed the same training on December 15, 2020, and recertified on December 30, 2021.  (ECF No. 122 at 25-26).

Thus, she, too, was not recertified in accordance with the guidelines as of December 18, 2021 when she deployed her taser against Plaintiff.[11]

Plaintiff also relies on the City of St. Albans' discovery responses about employee training. As noted in his own motion for summary judgment, the City of St. Albans made the following admissions:

> Request for Admission No. 4
>
> When an officer is not properly certified/re-certified that officer depending on the certification shall not continue his or her normal duties until properly certified/re-certified. A. Admit.
>
> Request for Admission No. 5
>
> An officer not certified to carry any weapon, equipment, etc. shall not carry that weapon, equipment, etc. until properly certified. If that certification expires, that officers is not to possess or carry that weapon, equipment, etc. until that officer is properly re-certified. A. Admits that officers would be prohibited from using equipment while in their role as St. Albans Police Officers.

(ECF No. 122 at 3-4; City of St. Albans' Responses to Request for Admissions, ECF No. 127, Ex. 1 at 34, REQUESTS 4 and 5).

Defendants' reply brief, however, argues that Plaintiff's training-based claims also fail because unsatisfactory training "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, *supra*, 489 U.S. at 390-91. (ECF No. 129 at 12). Defendants further assert that "Officers Beckner and Burdette were trained on the use of tasers *prior* to December 18, 2021" and that the "standard" created by the Axon PowerPoint is, at best, a

---

[11] Plaintiff also argues that the other Defendants were not recertified to use tasers on that specific date; however, since no Defendants other than Beckner and Burdette deployed tasers, the undersigned believes that fact to be immaterial to Plaintiff's claims herein. Plaintiff likewise makes arguments that certain individual Defendants had not completed updated firearms training as required. However, since no firearms were used during the incident in question, the undersigned finds this argument and evidence to be immaterial to the claims at hand as well.

third-party policy that is not determinative of constitutionality.  (*Id*. at 13).  Additionally, they contend that "[t]he Supreme Court has recognized that '[p]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."  *Harris*, 489 U.S. at 391.  (*Id*.)  The *Harris* Court further found that "permitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities[,]" which was rejected in *Monell*, and "would engage the federal courts in an endless exercise of second-guessing municipal employee-training programs."  489 U.S. at 492.  The Court further stated that "federal courts are ill-suited to undertake [this exercise which] . . . would implicate serious questions of federalism."  *Id.*

Based upon these admonitions from the Supreme Court, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has not developed sufficient factual support for his deliberate indifference claim grounded in a failure to train theory in order to hold the City of St. Albans liable under *Monell*.  Moreover, to the extent that Plaintiff is attempting to hold Defendant Truitt liable as a supervisor under a similar failure to train theory, Plaintiff has failed to establish any evidence to support or allow an inference to be drawn that Truitt knew that Defendants Beckner and Burdette were not properly re-certified for taser use on the night in question.  Additionally, the City of St. Albans' discovery responses indicate that [c]ertifications are handled by the training division of the St. Albans Police Department, not direct supervisors."  (ECF No. 127-1 at 33, REQUEST 2).  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Defendants, and not Plaintiff, are entitled to judgment as a matter of law on Plaintiff's *Monell* and supervisory liability claims on this basis.

*IV.    RECOMMENDATION*

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Defendants' Motion for Summary Judgment (ECF No. 118) with respect to Plaintiff's Fourth Amendment claim concerning the vehicle crash (Count I), his § 1985 conspiracy claim (Count II), his IIED claim (Count III), his simple negligence claim (Count IV), his Fourteenth Amendment claims (Counts I and V), his *Monell* claim against the City of St. Albans (Count X), and his supervisory liability claim against Lt. Truitt (Count XI), but **DENY** Defendants' Motion for Summary Judgment (ECF No. 118) with respect to Plaintiff's Fourth Amendment excessive force and failure to intervene claims against Defendants Beckner, Burdette, Cabell, and Truitt concerning the use of physical force and tasers after the motorcycle crash (Counts I and VII), and his companion assault and battery claims against those Defendants (Count VI), which should be set down for trial before a jury at a time convenient to the Court and the parties.  It is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** Plaintiff's Motion for Summary Judgment (ECF No. 122) as to all of his claims.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Frank W. Volk, Chief United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge

for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties and Chief Judge Volk.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Plaintiff, and to transmit a copy to counsel of record.

July 11, 2025

Dwane L. Tinsley
United States Magistrate Judge

43